UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MITSUI RAIL CAPITAL, LLC,

       Plaintiff,

v.

DETROIT CONNECTING RAILROAD COMPANY,
a Michigan corporation;

       Defendant.

**Consolidated Case No. 13-13502**
Hon. Marianne O. Battani
Magistrate Judge Hluchaniuk

___

LIBERTY SURPLUS INSURANCE
CORPORATION, a New Hampshire corporation

       Plaintiff,

v.

DETROIT CONNECTING RAILROAD COMPANY,
a Michigan corporation;

       Defendant/Cross-Plaintiff,

v.

FERROUS PROCESSING AND TRADING COMPANY,
a Michigan corporation,

       Defendant/Cross-Defendant.

___

**PLAINTIFF LIBERTY SURPLUS INSURANCE CORPORATION'S
RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In response to the Motion for Summary Judgment filed by Detroit Connecting Railroad ("DConn"), Plaintiff, Liberty Surplus Insurance Corporation relies on the attached Brief in Support.

/s/ Richard M. Mitchell
Richard M. Mitchell (P45257)
Daniel U. Warsh (P75515)
Maddin, Hauser, Roth & Heller, P.C.
28400 Northwestern Highway, 2nd Floor
Southfield, MI  48034
(248) 354-4030
rmitchell@maddinhauser.com
dwarsh@maddinhauser.com
Attorneys for Plaintiff Liberty

DATED:  October 2, 2014

# BRIEF IN SUPPORT OF
# PLAINTIFF LIBERTY SURPLUS INSURANCE CORPORATION'S
# RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This matter arises from the lease of certain railroad cars by Mitsui Rail Capital, LLC ("Mitsui") to Detroit Connecting Railroad Company ("DConn") from 2002 to 2012. Upon termination of the lease between Mitsui and DConn, it became apparent that just about all of the cars had been damaged while in the possession of DConn or those parties to whom DConn subleased the cars (in further violation of the Lease). Plaintiff Liberty Surplus Insurance ("Liberty") subrogated Mitsui's claim in this action after having paid for the property damage to the railroad cars, and seeks recovery from DConn in the amount of $262,709.38.

In its Motion for Summary Judgment, DConn repeatedly argues that Mitsui cannot show how, when, or why the damage to the cars occurred. DConn's argument misses the mark, however, because causation is <u>wholly irrelevant</u> to the question of liability before the Court. Indeed, DConn cites no authority for its novel interpretation of the American Railroad ("AAR")'s interchange rules or the lease terms, and instead asks this Court to ignore black letter law that is right on point.

Furthermore, in its Motion, DConn fails to engage with the extensive testamentary and documentary record disputing their position and, in fact, makes internally inconsistent

arguments which actually support Liberty's position.[1] Indeed, perhaps had DConn spent less time in its brief slinging personal jabs and insults at employees of Mitsui, it would have been able to cobble together a coherent argument, but such is not the case. Therefore, DConn's Motion must be denied because it is inconsistent with binding law on point.

## LAW & ARGUMENT

A. **Under the AAR Rules, the obligation to pay for the repairs at issue rests with DConn, not Mitsui, and this Court has previously interpreted the AAR Rules in a manner consistent with Liberty's – but not DConn's – interpretation.**

This Court dealt with a situation identical to the instant case in *Greyhound Financial Corporation v. Grand Trunk Western Railroad Co,* 796 F. Supp. 1019 (E.D. Mich. 1992) and unequivocally found in favor of the rail car lessor. As discussed in Liberty's own Motion for Summary Judgment, the issue in *Greyhound*, as here, was whether a lessee was liable for damages for failing to return leased rail cars in good condition to a lessor following the conclusion of the lease. Like the Lease in the instant case, the lease in *Greyhound* placed an affirmative duty of repair on the lessee for the leased cars:

> V. SERVICE: (b) Lessee will at its sole expense at all times during the term of this Agreement maintain each Unit in good operating order, repair, condition and appearance, normal wear and tear excepted....

---

[1] For example, on page 3, DConn states that "no substantial issues or necessary repairs were discovered" at the February 2, 2012 inspection. DConn then backpedals on page 4, and admits that there was "damage seen at the joint inspection" but that it felt it was being overcharged for the damage's remediation.

> IX. RETURN OF EQUIPMENT: Lessee agrees, by the acceptance of each Unit, that such Unit is in good operating order, repair, condition and appearance. At the expiration or sooner termination of the term pertaining thereto, Lessee will return each Unit to Lessor free of all advertising or insignia placed thereon by Lessee *and in the same operating order, repair, condition and appearance as when received, excepting only for reasonable wear and tear and damage…*

*Id.* (emphasis in original). Like Mitsui and DConn, the litigants in *Greyhound* were both bound by the standards and rules of the AAR. *Id.* at 1021.[2]

At the end of the lease term, Greyhound engaged the services of two independent evaluators with experience conducting AAR damage inspections to inspect the leased boxcars in question prior to their return. *Id.* The investigators each found that the boxcars were not in good operating order, repair, condition or appearance. In the aggregate, the investigators concluded that there had been "extreme mechanical wear" thereby rendering the boxcars "unacceptable for return, according to the lease." *Id.* at 1022. The boxcars all needed extensive and costly reconditioning before they could be re-used or re-leased.

It is important to highlight that in arriving at their respective conclusions, the experts both relied on AAR damage rules to make the determinations that the damage sustained by the boxcars rendered them unfit for use. The Court explicitly adopted this approach, noting that

---

[2] The *Greyhound* Court utilized the 1989 version of the Rules; for purposes of the analysis, there have been no meaningful changes to the Rules between that version and the version relied upon by Mitsui and DConn in this litigation.

1579425 v2/11007.0033                                5

> As was mentioned previously, the AAR rules were enacted by the Operating Transportation Committee which oversees all committees relating to locomotives and their interchange within the AAR. The Operating Transportation Committee must, therefore, be comprised of the leadership of the railway industry, and **the Court finds the AAR Field Manual authoritative as it pertains to the proper maintenance and repair of boxcars and in interpretation of the requirements of the Lease.**

*Id.* at 1024 (emphasis added).  The Court also stated that

> AAR Rules 88 and 89 govern the interchange of freight traffic by insuring that a car which is offered or accepted in interchange meets certain minimum standards to assure that it has no basic structural weakness or damage that would cause an unsafe operating condition on an accepting line. The Rules also assure against unfair rejections, or opportunistic making of unnecessary repairs and billing therefor.

*Id.* at 1021.

In the Court's opinion, <u>**it did not matter at all to the Court why the repairs were not made to the leased boxcars – all that mattered was that they were not:**</u>

> Likewise, in the present case, Grand Trunk may not avoid liability solely based on the fact that it no longer chose to use those particular boxcars when the express provisions of the lease mandate otherwise. It was required under the lease for Grand Trunk to return the cars in good operating condition. Therefore, this Court finds that Grand Trunk's failure to do so is a breach of the Lease, as Plaintiff has claimed.

*Id.*

As was the case in *Greyhound*, DConn, like the Grand Trunk Railroad, was obligated to return the leased rail cars to Mitsui at the end of the term in good operating condition. Paragraph 8(a) of the Lease could not be clearer:

> Except as otherwise provided herein, Lessor shall, at its expense, perform or arrange and pay for the performance of inspection, maintenance and repairs to the Cars as shall be necessary to maintain the Cars in good operating condition as specified in AAR Interchange and FRA Rules...

Paragraph 12(a), governing return of the cars at the end of the Lease, further required DConn to "deliver each Car to Lessor...in the condition required by Article 8 (Maintenance and Repair) of this Agreement." It cannot be disputed that DConn returned the cars with extensive damage in violation of the Lease and the AAR Rules.

In its Motion, DConn argues that because Mitsui cannot pinpoint the dates, times, or responsible parties for the damage in question, it is somehow absolved of liability. Apparently, DConn bases this interpretation on its own reading of the AAR Rules, without any basis in law to make such a conclusion. Clearly, DConn's position is not a tenable position in light of *Greyhound*. It also makes no difference that DConn might not have been using the cars in question itself (but rather had subleased them out, which was also a violation of the Lease) when the damage occurred. **Per *Greyhound*, as a matter of law, all that matters is that the cars were not returned by the lessee (DConn) to the lessor (Mitsui) in a satisfactory condition as required under the Lease**. This is why DConn's

arguments ultimately must fail – how, why, by whom, or when the cars were damaged simply <u>does not matter</u>. The fact that DConn returned them in a damaged state means DConn is the responsible party under the AAR rules. Therefore, as a matter of law, Liberty is entitled to prevail on its claim.

B. **Other cases interpreting the AAR Rules (specifically, AAR Rules 89 and 95) in the context of damage liability routinely assign responsibility to the *operating*, and not the *owning*, railroad line.**

In its halfhearted attempt to evade liability, DConn tries to rely on AAR Rule 96, which generally provides that a rail car lessee is responsible for repairs on rail cars, unless circumstances warranting an exception (such as handling line damage) occur. Ironically, this argument is entirely consistent with Liberty's position in this case – there has never been any dispute that Mitsui (Liberty) is otherwise responsible for "running repairs" and normal wear and tear. This reality, however, is inconvenient for DConn's narrative, so DConn has chosen to focus instead on the fact that Mitsui cannot state with specificity how, when, where, or why the damage occurred to the cars in question. The Court should not be distracted by DConn's avoidance tactics.

As it turns out, DConn does in fact acknowledge that it could be found liable for damaged cars pursuant to AAR Rule 95, which deals with handling line damage. *See Generally Plaintiff's Motion at 9-11*. AAR Rule 95 holds a handling rail company responsible for damage or loss resulting from "unfair usage" of rail cars. Without any analysis or support

whatsoever, DConn baldly proclaims that it was not the "handling line" of the rail cars in question, therefore absolving it of responsibility.  *Plaintiff's Motion at 9.*  More preposterously, DConn then asserts that Rule 95 is a "narrow exception" and is otherwise "inapplicable to this case."  *Id.*  There is no explanation as to why DConn believes Rule 95 to be a "narrow exception," nor is there any explanation as to why it does not apply here.  DConn cites no cases or other authority in furtherance of its position nor does it otherwise provide this Court with any meaningful legal rationale to accept its interpretation.  Perhaps this is because all of the cases interpreting AAR Rules such as Rule 95 have held that it (and others) are <u>exactly applicable to circumstances such as those in the instant case.</u>

Similarly, other AAR rules, including some cited by DConn, place responsibility for mishaps *of any kind* squarely upon the railroad operating those cars rather than anyone else, notwithstanding DConn's hollow protestations to the contrary.  For example, AAR Rule 89 provides, in pertinent part:

> The receiving road is responsible for damage designated as unfair usage in these rules, that occurs after cars are placed on designated interchange track by the delivery carrier.

The Ninth Circuit dealt with this issue directly in *Torres v. Southern Pacific Transportation Company,* 584 F.2d 900 (9th Cir. 1978), a case involving the allocation of responsibility between a rail car's lessor and lessee for a death and personal injury arising from damage to a rail car.

In *Torres*, the Plaintiff was a Mexican alien who, after crossing the border illegally on foot, hopped on a freight train which was stopped on a side track. *Id.* at 901. The car in which he was riding developed a "hot box" (an overheated journal resulting from insufficient lubrication) which ultimately caused a derailment of fourteen cars, including the car in which the plaintiff was riding. *Id.* The Plaintiff's travel companion was killed and the Plaintiff was severely injured in the derailment. He brought suit against the lessor Santa Fe Railroad, because the cement hopper in which he was riding in was owned by Santa Fe but was on lease to the Southern Pacific under the AAR interchange rules. *Id.*

In granting summary judgment to the Santa Fe Railroad, the District Court found that as the lessor and owner of the car in question, the Santa Fe Railroad was not responsible for any of Plaintiff's injuries. In upholding the District Court's grant of summary judgment, the Ninth Circuit reaffirmed that the AAR rules (in particular, Rule 89) relieved the owning railroad **of all responsibility** once the transfer of a rail car is completed:

> It is well established that the duty to discover and remedy defects in railroad cars lies **primarily with the operating carrier. The AAR rules impose a duty on the part of the operating carrier to inspect the interchange cars at every interchange point, and they relieve the originating carrier of all responsibility for the car once the interchange has been affected.** (See AAR Rules 1, 89(g)(8).) The applicable regulations of the Interstate Commerce Commission 49 CFR §2139 et seq., likewise impose the primary inspection obligation on the operating carrier, while the Federal Safety Appliance Act, 45 U.S.C. s 1 (1972), Et seq. imposes liability for

> a defective railroad car solely on the carrier operating the car at the time of the accident...

*Id.* at 901-902, citing *Chicago, R. I. & P. R. R. v. Chicago & N. W. Ry.*, 280 F.2d 110 (8th Cir. 1960), *cert. denied,* 364 U.S. 931, 81 S.Ct. 378, 5 L.Ed.2d 364 (1961); *Clark v. Atlantic Coast Line R. R.*, 100 U.S. App. D.C. 279, 244 F.2d 368 (1957); *Patton v. Baltimore & O. R. R.,* 197 F.2d 732 (3rd Cir. 1952) (emphasis added).

Citing additional decisions from around the country, the *Torres* Court continued, observing that "[t]his emphasis upon the responsibility of the **operating carriers** has prompted some courts to relieve the originating carrier of **all legal liability once it has surrendered control of the car at the interchange point.**" *Id.* at 902 (citations omitted) (emphasis added). In short, it cannot be disputed as a matter of law that originating carriers (in this case, Mitsui) maintain no responsibility for their cars once there has been a transfer of a rail car at an interchange. When Mitsui transferred the leased rail cars to DConn in 2002, Mitsui was relieved of all responsibility except for that expressly carved out by the Lease (chiefly, "running repairs.")

The proclamations of these various decisions bear directly on DConn's liability for the damage sustained to Mitsui's rail cars. The AAR rules as well as the express language of the contract at issue both indicate that even if the damage occurred while the cars were out of DConn's possession, but were still being used in interchange, DConn remains responsible for any damage. DConn – and *only DConn* – is responsible for examining the

cars and noting any resulting damage caused by another line each time it received them back from the respective lines.

In addition to being supported by the case law, this approach also makes sense from a policy perspective, as DConn (and not Mitsui) would be in the best position to inspect the rail cars each time it got them back. For example, when DConn received the cars back from Canadian National or any other vendor to which it leased or subleased them, it should have conducted its own inspection at that time and noted any damage, and then assessed Canadian National or the other vendor, as would have been its right and obligation under the AAR Rules. DConn has never suggested that it conducted any such inspections, nor has it produced any evidence of any kind showing such inspections took place. It is certainly DConn's prerogative not to conduct such inspections, but that only means that DConn (and not, for example, Canadian National) becomes responsible for damage because DConn accepted the cars back in a damaged state. In other words, by failing to act and taking back damaged cars, DConn waived any claims it had against other parties which may, in fact, have been financially responsible for the damage sustained by the cars in question. DConn's negligence, however, does not shift the obligation to pay to Mitsui.

## CONCLUSION

In conclusion, as a matter of law DConn is responsible for the damage sustained by Mitsui's rail cars. This is the only possible result following the AAR rules as well as the

applicable case law interpreting them. It is undisputed that DConn leased the rail cars in question and returned them in an unacceptable condition, not in accordance with its obligations under the Lease.

WHEREFORE, Liberty respectfully requests that this Honorable Court deny Plaintiff's Motion for Summary Judgment against Liberty, grant Liberty's Motion for Summary Judgment, and award Liberty all damages, as well as any other relief this Court finds just and appropriate.

*/s/ Richard M. Mitchell*
Richard M. Mitchell (P45257)
Daniel U. Warsh (P75515)
Maddin, Hauser, Roth & Heller, P.C.
28400 Northwestern Highway, 2nd Floor
Southfield, MI  48034
(248) 354-4030
rmitchell@maddinhauser.com
dwarsh@maddinhauser.com
Attorneys for Plaintiff Liberty

DATED:  October 2, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2014 I electronically filed the above document(s) with the Clerk of the Court using the ECF system, which will send notification of such filing to those who are currently on the list to receive e-mail notices for this case.

/s/ Richard M. Mitchell
Richard M. Mitchell (P45257)
Daniel U. Warsh (P75515)
Maddin, Hauser, Roth & Heller, P.C.
28400 Northwestern Highway, 2nd Floor
Southfield, MI  48034
(248) 354-4030
rmitchell@maddinhauser.com
dwarsh@maddinhauser.com
Attorneys for Plaintiff Liberty

DATED:  October 2, 2014